**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **DAVID PUCKETT,** individually and on behalf of all others similarly situated,<br><br>Arlington, VA<br><br>Plaintiff,<br><br>v.<br><br>**THE RETINA GROUP OF WASHINGTON, PLLC,**<br>7501 Greenway Center Drive, Suite 300<br>Greenbelt, Maryland 20770<br><br>Defendant. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | CIVIL ACTION NO.____________________<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff David Puckett ("Plaintiff"), by and through his attorneys of record, upon personal knowledge as to his own acts and experiences, and upon information and belief as to all other matters, files this complaint against The Retina Group of Washington, PLLC ("RGW" or "Defendant") and alleges the following:

## <u>NATURE OF THE ACTION</u>

1. Plaintiff brings this class action complaint on behalf of a class of persons impacted by Defendant's failure to safeguard, monitor, maintain and protect highly sensitive Personal Health Information ("PHI") and Personally Identifiable Information ("PII") (collectively "Sensitive Information"). Defendant collected, stored, and maintained its current and former patients', including Plaintiff's and Class Members', Sensitive Information as part of its provision of healthcare services.

2. On or around March 26, 2023, RGW discovered that an unauthorized third party had gained access to its network system and acquired files containing information about RGW's current and former patients (the "Data Breach"). Specifically, RGW determined that the Data Breach "resulted in the unauthorized acquisition" of its patients' Sensitive Information, including "name, Social Security number [("SSN")], driver's license number or other government-issued identification number, medical record number, address, telephone number, email address, date of birth, date of service, and/or other demographic information as well as health, payment, and/or insurance information."[1]

3. Although Defendant discovered the Data Breach on or around March 26, 2023, it inexplicably waited until on or around December 22, 2023, nearly nine months later, to purportedly begin issuing data breach letters (the "Notice") to the patients impacted by the Data Breach. In its online Data Breach notice, Defendant admitted that its networks and systems had been breached and that the cyberattack exposed highly sensitive information.

4. The type of information impacted by the Data Breach can be used to orchestrate a host of fraudulent activities, including medical, insurance, and financial fraud and identity theft. Indeed, the entire purpose of these types of medical data breaches is to misuse the stolen information or to sell it to fraudsters on the dark web. Consequently, all impacted individuals are at a heightened and significant risk that their information will be disclosed to criminals and misused for attempted or actual fraud or identity theft.

5. As a result of Defendant's lax data security concerning its systems and servers, hundreds of thousands of Defendant's patients have had sensitive details of their lives and

---

[1] *Notice of Data Breach*, RETINA GROUP OF WASH., https://www.rgw.com/notice-of-data-breach/ (last visited Jan. 10, 2024).

identities accessed, viewed and stolen by malicious cybercriminals. These patients have been placed in an immediate and continuing risk of harm from fraud, identity theft, and related harm caused by the Data Breach.

6. Further, as a result of Defendant's delayed response and Notice, Plaintiff and Class Members had no idea for *nine months* that their Sensitive Information had been compromised and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. This risk will remain for their respective lifetimes.

7. There has been no assurance offered by RGW that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhances its data security practices sufficient to avoid a similar breach of its network in the future.

8. Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing risk of suffering ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Sensitive Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

9. As such, Plaintiff, individually and on behalf of the Class, brings this action to recover for the harms caused by the Data Breach and asserts the following claims: (I) Negligence, (II) Negligence Per Se, (III) Breach of Implied Contract, (IV) Unjust Enrichment, (V) Breach of Fiduciary Duty, (VI) Invasion of Privacy—Publication of Private Facts, and (VII) Violation of the Virginia Data Breach Notification Law.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of

interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from RGW. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

11. This Court has jurisdiction over RGW because it maintains its principal place of business in this District, regularly conducts business in Maryland, and has sufficient minimum contacts in Maryland.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because RGW's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

**THE PARTIES**

13. Plaintiff David Puckett is a natural person and citizen of the State of Virginia, residing in Arlington, Virginia. He is a current patient of RGW and received healthcare services from RGW's Fairfax, Virginia facility. Plaintiff Puckett provided Defendant with his sensitive PII and PHI for purposes of receiving healthcare services. He received a Data Breach Notice Letter on or around December 22, 2023, informing him that his Sensitive Information was part of Defendant's Data Breach, including his name, SSN, driver's license number or other government-issued identification number, medical record number, address, telephone number, email address, date of birth, date of service, and/or other demographic information as well as health, payment, and/or insurance information.[2]

---

[2] Data Breach Notice Letter from The Retina Group of Washington, PLLC, to David Puckett (Dec. 22, 2023) (attached as Exhibit A).

14. Defendant The Retina Group of Washington, PLLC is a Virginia limited liability company with its principal place of business at 7501 Greenway Center Drive, Suite 300, Greenbelt, Maryland 20770. It can be served through its registered agent, Corporation Service Company, at 100 Shockoe Slip, Floor 2, Richmond, Virginia 23219.

## COMMON FACTUAL ALLEGATIONS

### A. Defendant Collected, Maintained and Stored Sensitive Information

15. RGW is an eye care clinic specializing in ophthalmology for retina diseases and vitreoretinal surgery that serves thousands of patients in Washington, D.C., Maryland, and Virginia.[3] RGW consists of 37 board-certified ophthalmologists and eye surgeons who offer the most advanced procedures in treating retinal diseases, conditions, and disorders across RGW's 17 locations.[4]

16. As an ordinary and regular part of the services that it provides to its patients, Defendant collects, creates, and maintains patients' Sensitive Information. Defendant's Notice of Data Breach, posted online, claims that "The Retina Group of Washington . . . places a high value on maintaining the privacy and security of patient information."[5]

17. As a prerequisite to receiving healthcare services, Defendant requires its patients to provide it with their Sensitive Information. In the ordinary course of receiving services from Defendant, Plaintiff and Class Members were required to provide their Sensitive Information to Defendant.

---

[3] *Home*, RETINA GROUP OF WASH., https://www.rgw.com/ (last visited Jan. 10, 2024).

[4] *Locations*, RETINA GROUP OF WASH., https://www.rgw.com/retina-center-locations/ (last visited Jan. 10, 2024); *Doctors*, RETINA GROUP OF WASH., https://www.rgw.com/eye-doctors-specialists-surgeons/ (last visited Jan. 10, 2024).

[5] *Notice of Data Breach*, *supra* note 1.

18. The PHI and PII that Defendant maintains is highly sensitive. To obtain healthcare services, patients, like Plaintiff and Class Members, must provide Defendant with highly sensitive information, including PHI, PII, or both. As a sizable healthcare services provider, Defendant has collected and maintained a depository of Sensitive Information, a particularly lucrative target for data thieves looking to obtain and misuse or sell patient data.

19. Plaintiff and Class Members had a reasonable expectation that Defendant would protect the Sensitive Information that it collected and maintained, especially because, given the publicity of other data breaches and the significant impact they had, Defendant knew or should have known that failing to adequately protect Plaintiff's and Class Members' Sensitive Information could cause substantial harm.

20. Defendant's Notice of Privacy Practices acknowledges the sensitivity of the information that it maintains, along with the legal requirements for Defendant to confidentially maintain such information.

21. Specifically, Defendant's Notice of Privacy Practices provides:

> This notice will tell you about the ways we may use and disclose medical information about you. We also describe your rights and our obligations regarding the use and disclosure of medical information.
>
> We are required by law to:
> - make sure that medical information that identifies you is kept private;
> - give you this notice of our legal duties and privacy practices with respect to your medical information;
> - follow the terms of the notice that is currently in effect; and
> - notify individuals, either known or reasonably believed to be affected, following a breach of unsecured protected health information.[6]

[6] *Notice of Privacy Practices*, PRISM VISION GROUP (Sept. 15, 2020), https://prismvisiongroup.com/wordpress/wp-content/uploads/2022/02/PRISM-Notice-of-Privacy-Practices-Revised-2.21.22.pdf.

22. Defendant's Notice of Privacy Practices states that it may use patients' medical information "for treatment, payment, healthcare operations, research or fundraising purposes."[7] The Notice of Privacy Practices further details circumstances under which Defendant may use and disclose Plaintiff's and Class Members' Sensitive Information, none of which include disclosure of such Sensitive Information to cybercriminals.[8]

23. Plaintiff and Class Members relied on Defendant's representations that their Sensitive Information would be secure before purchasing eyecare services from Defendant.

24. In purchasing eyecare services from Defendant, Plaintiff and Class Members relied on Defendant to keep their Sensitive Information confidential and securely maintained.

25. As described throughout this Complaint, Defendant did not reasonably protect, secure, or store Plaintiff's and Class Members' Sensitive Information prior to, during, or after the Data Breach, but rather enacted unreasonable data security measures that it knew or should have known were insufficient to reasonably protect the highly sensitive information Defendant maintained. Consequently, cybercriminals circumvented Defendant's security measures, resulting in a significant data breach.

**B. Defendant's Data Breach Exposed Patients' Sensitive Information**

26. On March 26, 2023, Defendant discovered suspicious activity on its systems. Defendant claims to have initiated an investigation and taken containment measures at that point, but those measures were clearly insufficient. Defendant later admitted that third-party hackers had gained access to its systems, gained access to highly sensitive PII and PHI, and acquired a cache of Defendant's patients' information. Upon information and belief, during the Data Breach, the

[7] *Id.*
[8] *Id.*

hackers copied and/or exfiltrated substantial amounts of Plaintiff's and Class Members' Sensitive Information.

27. Defendant waited roughly *nine months* to start providing notice to the individuals impacted by the Data Breach. Specifically, despite identifying the Data Breach on March 26, 2023, Defendant did not notify Plaintiff and Class Members of the compromise of their Sensitive Information until on or around December 22, 2023. A delay of more than four months is patently unreasonable and put Plaintiff and Class Members at a continued and significant risk of harm that their stolen data, capable of being used for medical, insurance, or financial fraud and identity theft, would be misused. Had Defendant provided notice sooner, Plaintiff and Class Members would have been able to take mitigatory steps sooner.

28. In its Notice of Data Breach, Defendant states:

> The Retina Group of Washington ("RGW" or "we") places a high value on maintaining the privacy and security of patient information. Regrettably, this notice is to inform you that we were recently the victim of a cybersecurity incident (the "Incident") that resulted in the unauthorized acquisition of some of our patients' information. This notice explains the Incident, the measures we have taken in response, and the proactive steps potentially impacted individuals can take.
>
> **What Happened?** On March 26, 2023, we began experiencing difficulty accessing information in some of our systems. Immediately upon becoming aware that we were experiencing a potential security incident, we took steps to secure the affected systems. We determined that we were the victim of a cybersecurity incident, initiated a privileged and confidential investigation, and reported the incident to the Federal Bureau of Investigation. While our investigation of the Incident is ongoing, we have determined that the Incident resulted in the unauthorized acquisition of some of our patients' information, and we are in the process of identifying and notifying impacted patients.
>
> **What Information Was Involved?** Although the information involved varied among the impacted patients, the information may have included patient name, Social Security number, driver's license number or other government-issued identification number, medical record number, address, telephone number, email address, date of birth, date of service, and/or other demographic information as well

> as health, payment, and/or insurance information. At this time, we do not have evidence of any misuse of any patient information.[9]

29. Defendant identified only the following actions it undertook to mitigate and remediate the harm caused by the Data Breach in the Notice of Data Breach:

> **What Are We Doing?** Immediately upon becoming aware that we were experiencing a potential security incident, we took steps to secure the affected systems. We determined that we were the victim of a cybersecurity incident, initiated a privileged and confidential investigation, and reported the Incident to the Federal Bureau of Investigation. While our investigation of the Incident is ongoing, we have determined that the Incident resulted in the unauthorized acquisition of some of our patients' information, and we are in the process of identifying and notifying impacted patients. To help prevent similar incidents from happening in the future, we have implemented and are continuing to implement additional procedures and security measures to further strengthen the security of our systems.[10]

30. Defendant recognized the substantial and high likelihood that Plaintiff's and Class Members' Sensitive Information would be misused, instructing affected individuals "to remain vigilant against incidents of identity theft and fraud, to review their account and explanation of benefits statements, and to monitor their free credit reports for suspicious activity and to detect errors."[11]

31. Defendant also offered temporary credit monitoring services through TransUnion. Such measures, however, are insufficient to protect Plaintiff and Class Members from the lifetime risks they each now face. As another element of damages, Plaintiff and Class Members seek a sum of money sufficient to provide Plaintiff and Class Members identity theft protection services for their respective lifetimes.

---

[9] *Notice of Data Breach*, *supra* note 1.

[10] *Id.*

[11] *Id.*

32. Defendant largely put the burden on Plaintiff and Class Members to take measures to protect themselves.

33. Given that Defendant was storing the Sensitive Information of Plaintiff and Class Members and knew or should have known of the serious risk and harm caused by a data breach, Defendant was obligated to implement reasonable measures to prevent and detect cyber-attacks, such as those recommended by the Federal Trade Commission, required by the Health Insurance Portability and Accountability Act, and promoted by data security experts and other agencies. That obligation stems from the foreseeable risk of a Data Breach given that Defendant collected, stored, and had access to a swath of highly sensitive patient records and data and, additionally, because other highly publicized data breaches at numerous healthcare institutions put Defendant on notice that the personal and sensitive data they stored might be targeted by cybercriminals.

34. Indeed, cyberattacks on medical systems and healthcare companies like Defendant have become so notorious that the Federal Bureau of Investigation and United States Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[12]

35. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in recent years.[13]

---

[12] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[13] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

36. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

37. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry and the prevalence of healthcare data breaches, Defendant inexplicably failed to adopt sufficient data security processes by, without limitation:

a. Failing to properly select its information security partners;

b. Failing to ensure the proper monitoring and logging of the ingress and egress of network traffic;

c. Failing to ensure the proper monitoring and logging of file access and modifications;

d. Failing to ensure the proper training its and its technology partners' employees as to cybersecurity best practices;

e. Failing to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII and PHI of Plaintiff and Class Members;

f. Failing to timely and accurately disclose that Plaintiff's and Class Members' PII and PHI had been improperly acquired or accessed;

g. Knowingly disregarding standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII and PHI; and

h. Failing to provide adequate supervision and oversight of the PII and PHI with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII and PHI

of Plaintiff and Class Members, misuse the PHI/PII and potentially disclose it to others without consent.

38. Upon information and belief, Defendant further failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data security incidents, to ensure the proper encryption of Plaintiff's and Class Members' Sensitive Information, and to monitor user behavior and activity to identify possible threats.

39. Time is of the essence when highly sensitive PII and PHI is subject to unauthorized access and/or acquisition. The disclosed, accessed, and/or acquired PII and PHI of Plaintiff and Class Members is likely available on the Dark Web. Hackers can access and then offer for sale the unencrypted, unredacted PII and PHI to criminals. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the possible publication of their PII and PHI onto the Dark Web. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing sensitive personal information.

40. Despite the highly sensitive nature of the information Defendant obtained, maintained, and stored and the prevalence of health care data breaches, Defendant inexplicably failed to take appropriate steps to safeguard the Sensitive Information of Plaintiff and Class Members from being compromised. The Data Breach itself, and information Defendant has disclosed about the breach to date, including its length, the need to remediate Defendant's cybersecurity, the number of people impacted, and the sensitive nature of the impacted data collectively demonstrate Defendant failed to implement reasonable measures to prevent cyber-attacks and the exposure of the Sensitive Information it oversaw.

**C. Defendant Failed to Comply with FTC Guidelines**

41. The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[14]

42. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

43. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[15] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[16]

---

[14] Pamela Jones Harbour, Commissioner, Fed. Trade Comm'n, Remarks Before FTC Exploring Privacy Roundtable (Dec. 7, 2009), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[15] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[16] *Id.*

44. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[17]

45. The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require:

(1) encrypting information stored on computer networks;

(2) retaining payment card information only as long as necessary;

(3) properly disposing of personal information that is no longer needed or can be disposed pursuant to relevant state and federal laws;

(4) limiting administrative access to business systems;

(5) using industry unapproved activity;

(6) monitoring activity on networks to uncover unapproved activity;

(7) verifying that privacy and security features function property;

(8) testing for common vulnerabilities; and

(9) updating and patching third-party software.[18]

46. The FTC cautions businesses that failure to protect Sensitive Information and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can

[17] Fed. Trade Comm'n, *Start with Security: A Guide for Business* (2015), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[18] *Id.*

take time, money and patience to resolve the effect.[19] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures—like Defendant failed to do here—as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

47. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

48. These FTC enforcement actions include actions against healthcare providers and partners like Defendant.[20]

49. Defendant failed to properly implement basic data security practices.

50. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Sensitive Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

51. Defendant was at all times fully aware of the obligation to protect the Sensitive Information of customers and patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**D. Defendant Failed to Comply with Industry Standards**

---

[19] *See* FED. TRADE COMM'N, TAKING CHARGE, WHAT TO DO IF YOUR IDENTITY IS STOLEN at 3 (2012), *available at* https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf.

[20] *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

52. As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the Sensitive Information which they collect and maintain.

53. Several best practices have been identified that at a minimum should be implemented by healthcare providers like Defendant, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

54. The United States Government and the United States Cybersecurity & Infrastructure Security Agency recommend several similar and supplemental measures to prevent and detect cyber-attacks, including, but not limited to: implementing an awareness and training program, enabling strong spam filters, scanning incoming and outgoing emails, configuring firewalls, automating anti-virus and anti-malware programs, managing privileged accounts, configuring access controls, disabling remote desktop protocol, and updating and patching computers.

55. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

56. Defendant failed to meet the minimum standards of any of the following

frameworks: the NIST Cybersecurity Framework Version 1.1[21] (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls[22] (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

57. The FBI's Internet Crime Complaint (IC3) 2019 estimated there was more than $3.5 billion in losses to individual and business victims due to identity fraud in that year alone. The same report identified "rapid reporting" as a tool to help law enforcement stop fraudulent transactions and mitigate losses.

58. Defendant did not rapidly, or even reasonably, report to Plaintiff and Class Members that their Sensitive Information had been exposed or stolen. Instead, Defendant waited roughly nine months after identifying the Data Breach before notifying Plaintiff and Class Members of the Data Breach.

59. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**E. Defendant's Conduct Violates HIPAA and Evidences Its Insufficient Data Security**

---

[21] Nat'l Inst. of Standards & Tech., *Framework for Improving Critical Infrastructure Cybersecurity* (2018), *available at* https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf.

[22] *See The 18 CIS Critical Security Controls*, CTR. FOR INTERNET SEC., https://www.cisecurity.org/controls/cis-controls-list (last visited May 11, 2023).

60. The Health Insurance Portability and Accountability Act ("HIPAA") requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

61. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PII and PHI. Safeguards must include physical, technical, and administrative components.[23]

62. Title II of HIPAA contains what are known as the Administrative Simplification provisions.[24] These provisions require, among other things, that the Department of Health and Human Services ("DHHS") create rules to streamline the standards for handling PII and PHI, like the data Defendant left unguarded. The DHHS subsequently promulgated multiple regulations under the authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1)–(4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

63. The Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. It can be inferred from Defendant's Data Breach that Defendant either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiff's and Class Members' PHI.

64. Plaintiff's and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by 45 C.F.R. § 160.103.

---

[23] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

[24] 42 U.S.C. §§ 1301, *et seq*.

65. 45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

66. 45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

67. Plaintiff's and Class Members' Sensitive Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

68. Plaintiff's and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

69. Based upon Defendant's Notice to Plaintiff and Class Members, Defendant reasonably believes that Plaintiff's and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

70. Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

71. Defendant reasonably believes that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

72. Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach,

and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

73. Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

74. Defendant reasonably believes that Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

75. It is reasonable to infer that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

76. It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

77. After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiff and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

78. In addition, Defendant's Data Breach could have been prevented if Defendant had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

79. Defendant's security failures also include, but are not limited to:

a. Failing to maintain an adequate data security system to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and integrity of electronic protected health information Defendant creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g. Failing to identify and respond to suspected or known security incidents;

h. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

i. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

j. Failing to protect against any reasonably anticipated uses or disclosures of

electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

k. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(94);

l. Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

m. Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key;"[25] and

n. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq*.

80. The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414 also required Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*" (emphasis added).

81. Because Defendant has failed to comply with HIPAA, while monetary relief may

[25] 45 C.F.R. § 164.304.

cure some of Plaintiff's and Class Members' injuries, injunctive relief is also necessary to ensure Defendant's approach to information security is adequate and appropriate going forward. Defendant still maintains the PHI and other highly sensitive PII of its current and former patients, including Plaintiff and Class Members. Without the supervision of the Court through injunctive relief, Plaintiff's and Class Members' Private Information remains at risk of subsequent data breaches.

**F. Cyberattacks and Data Breaches Cause Disruption and Put Victims at an Increased Risk of Fraud and Identity Theft**

82. Cyberattacks and data breaches at healthcare companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

83. Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[26]

84. Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[27]

85. The United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs

[26] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[27] *See* Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 HEALTH SERVICES RES. 971, 971–80 (2019), *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

and time to repair the damage to their good name and credit record."[28]

86. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

87. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[29]

---

[28] *See* U.S. Gov. Accountability Off., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* 2 (2007), *available at* https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[29] *See IdentityTheft.gov*, FED. TRADE COMM'N, https://www.identitytheft.gov/Steps (last visited May 18, 2023).

88. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

89. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

90. Moreover, theft of Sensitive Information is also gravely serious because Sensitive Information is an extremely valuable property right.[30]

91. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Sensitive Information has considerable market value.

92. Theft of PHI, in particular, is gravely serious. A thief may use customers' and patients' name or health insurance numbers "to see a doctor, get prescription drugs, buy medical devices, submit claims with [an] insurance provider, or get other medical care. If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health

---

[30] *See, e.g.,* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J. L. & TECH. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

insurance benefits you're able to sue. It could also hurt your credit."[31]

93. Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Sensitive Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

94. There may additionally be a substantial time lag—measured in years—between when harm occurs and when it is discovered, and also between when Sensitive Information and/or financial information is stolen and when it is used.

95. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[32]

96. Sensitive Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

97. There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

---

[31] *What To Know About Medical Identity Theft*, FED. TRADE COMM'N, https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited May 18, 2023).

[32] GAO Report, *supra* note 38, at 29.

98. Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

99. Sensitive Information can sell for as much as $363 per record according to the Infosec Institute.[33] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

100. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[34] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[35] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

101. Moreover, it is not an easy task to change or cancel a stolen Social Security number.

102. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the

---

[33] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[34] Soc. Sec. Admin., Pub. No. 05-10064, *Identity Theft and Your Social Security Number* 1 (2021), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf.

[35] *Id.* at 4.

old number, so all of that old bad information is quickly inherited into the new Social Security number."[36]

103. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[37]

104. Medical information is especially valuable to identity thieves.

105. According to account monitoring company LogDog, coveted Social Security numbers were selling on the dark web for just $1 in 2016 – the same as a Facebook account.[38] That pales in comparison with the asking price for medical data, which was selling for $50 and up.[39]

106. Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

107. For this reason, Defendant knew or should have known about these dangers and strengthened its data systems and data security measures accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

---

[36] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[37] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORKWORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[38] *See* Omri Toppol, *Email Security: How You Are Doing It Wrong & Paying Too Much*, LOGDOG (Feb. 14, 2016), https://getlogdog.com/blogdog/email-security-you-are-doing-it-wrong/.

[39] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, NAKED SECURITY (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

**G. Plaintiff's and Class Members' Damages**

108. Plaintiff and Class Members have been damaged by the compromise of their Sensitive Information in the Data Breach.

109. Plaintiff's and Class Members' Sensitive Information was compromised in the Data Breach and is now in the hands of the cybercriminals who accessed the data Defendant held within its systems. The Sensitive Information exposed included "patient name, Social Security number, driver's license number or other government-issued identification number, medical record number, address, telephone number, email address, date of birth, date of service, and/or other demographic information as well as health, payment, and/or insurance information."[40]

110. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

111. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach, valuable time Plaintiff and Class Members otherwise would have spent on other activities, including but not limited to work and/or recreation.

112. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

113. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Sensitive Information as potential

[40] *Notice of Data Breach*, *supra* note 1.

fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

114. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

115. Plaintiff and Class Members also suffered a loss of value of their Sensitive Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

116. Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members who are current or former patients of Defendant overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards. Part of the price Plaintiff and Class Members paid to Defendant was intended to be used by Defendant to fund adequate data security practices to safeguard Plaintiff's and Class Members' Sensitive Information. As demonstrated by the Data Breach, Defendant failed to fund and provide adequate data security practices. Thus, Plaintiff and the Class Members who are current or former patients of Defendant did not get what they paid for and agreed to.

117. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably spent to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and,

f. Closely reviewing and monitoring their SSN, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

118. Moreover, Plaintiff and Class Members have an interest in ensuring that their Sensitive Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Sensitive Information is not accessible online or otherwise to unauthorized third parties.

119. Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Sensitive Information—which contains the most intimate details about a person's life, including what ailments they suffer, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

120. As a direct and proximate result of Defendant's actions and omissions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

**H. Plaintiff David Puckett's Experience**

121. Plaintiff Puckett is a resident and citizen of Virginia. Plaintiff Puckett is a current patient of Defendant.

122. As a condition of receiving healthcare services, Defendant required Plaintiff Puckett to provide the company with his Sensitive Information.

123. Plaintiff Puckett provided Defendant with his Sensitive Information in order to purchase and receive healthcare services.

124. On or about December 22, 2023, Plaintiff Puckett received a Notice of Data Breach from Defendant, which informed him of the Data Breach and that he faced a substantial and significant risk of his Sensitive Information being misused. The Notice informed Plaintiff that his Sensitive Information had been improperly accessed and acquired by unauthorized third parties. The Notice indicated that Plaintiff's Sensitive Information was compromised as a result of the Data Breach.

125. Plaintiff Puckett reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard his Sensitive Information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to the same. Plaintiff Puckett would not have used Defendant's services had he known that Defendant would not take reasonable steps to safeguard his Sensitive Information.

126. Shortly after, and as a result of the Data Breach, Plaintiff Puckett experienced actual fraud and/or identity theft when he received fraudulent purchases to his bank account, requiring him to replace his banking card. Additionally, Plaintiff has experienced an increase in spam calls and emails since the Data Breach.

127. Plaintiff Puckett is very careful about sharing his sensitive PII and PHI. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Puckett stores any documents containing his sensitive information

in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

128. As a result of the Data Breach and at the recommendation of Defendant and its Notice, Plaintiff Puckett made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial statements, monitoring his credit information, replacing his banking cards, and communicating with his bank about the fraudulent charges he experienced.

129. Plaintiff Puckett has spent significant time responding to the Data Breach and will continue to spend valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation.

130. Plaintiff Puckett suffered actual injury from having his sensitive information exposed and/or stolen as a result of the Data Breach including, but not limited to: (a) actual fraud and identity theft; (b) entrusting PII and PHI to Defendant that he would not have had Defendant disclosed it lacked data security practices adequate to safeguard its patients' Sensitive Information; (c) damages to and diminution in the value of his Sensitive Information–a form of intangible property that he entrusted to Defendant as a condition of receiving healthcare benefits services; (d) loss of his privacy; (e) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft; and (f) time and expense of his mitigation efforts as a result of the Data Breach.

131. Due to the Data Breach, Plaintiff Puckett anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes changing passwords, monitoring his medical history and health insurance information, and monitoring his other accounts for fraudulent activity.

132. In addition, knowing that hackers accessed and/or stole his PII and PHI to commit fraud and identity theft and that this will likely be used in the future for identity theft, fraud, and related purposes has caused Plaintiff Puckett to experience feelings of rage, anger, anxiety, sleep disruption, stress, fear, and physical pain. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

133. Plaintiff Puckett suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has experienced anxiety and increased concerns for the loss of his privacy, as well as anxiety over the impact of cybercriminals accessing and using his PII and PHI.

134. Plaintiff Puckett is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII and PHI being placed in the hands of unauthorized third parties/criminals.

135. Plaintiff Puckett has a continuing interest in ensuring that his PII and PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**CLASS ACTION ALLEGATIONS**

136. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the following Class and Subclass:

137. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals in the United States whose PII or PHI was impacted by the Data Breach, including all persons to whom Defendant sent a Notice of the Data Breach.

138. The Virginia Subclass that Plaintiff seeks to represent is defined as follows:

> All Virginia citizens whose PII or PHI was impacted by the Data Breach, including all persons to whom Defendant sent a Notice of the Data Breach.

139. The following people are excluded from the Classes: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

140. Plaintiff reserves the right to amend or modify the Class or Subclass definitions as the case progresses.

141. **Numerosity:** The exact number of members of the Classes is unknown but, upon information and belief, it is estimated to number in the tens or hundreds of thousands at this time, and individual joinder in this case is impracticable. Members of the Classes can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach, consumer breach of contract, unlawful trade practices, and class action controversies.

142. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff, and the members of the Classes, sustained damages arising out of Defendant's Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

143. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to

vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with, or are antagonistic to those of, the Classes, and Defendant has no defenses unique to Plaintiff.

144. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

a. Whether Defendant violated the laws asserted herein, including statutory privacy laws;

b. Whether Defendant had a duty to use reasonable care to safeguard Plaintiff's and members of the Classes' Sensitive Information;

c. Whether Defendant breached the duty to use reasonable care to safeguard Plaintiff's and members of the Classes' Sensitive Information;

d. Whether Defendant breached its contractual promises to safeguard Plaintiff's and members of the Classes' Sensitive Information;

e. Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing Sensitive Information;

f. Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff's and members of the Classes' Sensitive Information from unauthorized release and disclosure;

g. Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to

safeguard and protect Plaintiff's and members of the Classes' Sensitive Information from unauthorized release and disclosure;

h. Whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

i. Whether Defendant's delay in informing Plaintiff and members of the Classes of the Data Breach was unreasonable;

j. Whether Defendant's method of informing Plaintiff and other members of the Classes of the Data Breach was unreasonable;

k. Whether Defendant's conduct was likely to deceive the public;

l. Whether Defendant is liable for negligence or gross negligence;

m. Whether Defendant's conduct, practices, statements, and representations about the Data Breach of the Sensitive Information violated applicable state laws;

n. Whether Plaintiff and members of the Classes were injured as a proximate cause or result of the Data Breach;

o. Whether Plaintiff and members of the Classes were damaged as a proximate cause or result of Defendant's breach of its contract with Plaintiff and members of the Classes;

p. Whether Defendant's practices and representations related to the Data Breach breached implied contracts with Plaintiff and members of the Classes;

q. What the proper measure of damages is; and

r. Whether Plaintiff and members of the Classes are entitled to restitutionary, injunctive, declaratory, or other relief.

145. A class action is an appropriate method for the fair and efficient adjudication of this controversy.

146. **Superiority:** This cause is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendant's misconduct. Even if members of the Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

147. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted and/or refused to act on grounds generally applicable to the Classes such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Classes as a whole.

148. Finally, all members of the proposed Classes are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of the members of the Classes affected by the Data Breach. Members of the Classes have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### Count I
### Negligence
### (On Behalf of Plaintiff and the Nationwide Class)

149. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

150. Defendant required its patients, including Plaintiff and Class Members, to submit their Sensitive Information to receive Defendant's services.

151. By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer system—and Plaintiff's and Class Members' Sensitive Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

152. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, the personnel responsible for them, and its information technology partners adequately protected the Sensitive Information.

153. Plaintiff and the Class are a well-defined, foreseeable, and probable group of patients that Defendant was aware, or should have been aware, could be injured by inadequate data security measures.

154. A large repository of highly valuable healthcare and personal information is a foreseeable target for cybercriminals looking to steal and profit from that sensitive information.

Defendant knew or should have known that, given its repository of a host of Sensitive Information for thousands of patients posed a significant risk of being targeted for a data breach. Thus, Defendant had a duty to reasonably safeguard Plaintiff's and Class Members' data by implementing reasonable data security measures to protect against data breaches. The foreseeable harm to Plaintiff and the Class of inadequate data security created a duty to act reasonably and safeguard the Sensitive Information.

155. After all, PII and PHI are highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Sensitive Information of Plaintiff and Class Members. Thus, Defendant knew, or should have known, the importance of exercising reasonable care in handling the Sensitive Information entrusted to them.

156. Defendant's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

157. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information."[41] Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

158. In addition, Defendant has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, which prohibits "unfair . . . practices in or

[41] 45 C.F.R. § 164.530(c)(1).

affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.[42]

159. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Sensitive Information.

160. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Sensitive Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Sensitive Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to have in place mitigation policies and procedures;

d. Allowing unauthorized access to Plaintiff's and Class Members' Sensitive Information;

e. Failing to detect in a timely manner that Plaintiff's and Class Members' Sensitive Information had been compromised; and

f. Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

161. Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class Members' Sensitive Information by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite known data

[42] *See* 15 U.S.C. § 45.

breaches in the healthcare industry, and allowing unauthorized access to Plaintiff's and Class Members' Sensitive Information.

162. The failure of Defendant to comply with industry standards and federal regulations evidences Defendant's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Sensitive Information.

163. But for Defendant's wrongful and negligent breach of its duties to Plaintiff and Class Members, their Sensitive Information would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's negligence was a direct and legal cause of the theft of the Sensitive Information of Plaintiff and Class Members and all resulting damages.

164. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' Sensitive Information would result in injury to Plaintiff and Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

165. It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Sensitive Information would result in one or more types of injuries to Plaintiff and Class Members.

166. As a result of this misconduct by Defendant, the Sensitive Information of Plaintiff and Class Members was compromised, placing them at a greater risk of identity theft and of their Sensitive Information being disclosed to third parties without the consent of Plaintiff and the Class.

167. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

168. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit

to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

**Count II**
**Negligence Per Se**
**(On Behalf of Plaintiff and the Nationwide Class)**

169. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

170. Plaintiff alleges this negligence *per se* theory as alternative to Count I.

171. Pursuant to the laws set forth herein, including Virginia Code § 18.2-186.6 (the "VDBNL"), the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Sensitive Information.

172. Pursuant to the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, Defendant has a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Sensitive Information. Specifically, this statute prohibits "unfair . . . practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data.[43]

173. Moreover, Plaintiff and Class Members' injuries are precisely the type of injuries that the FTCA guards against. After all, the FTC has pursued numerous enforcement actions

[43] 15 U.S.C. § 45.

against businesses that—because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices—caused the very same injuries that Defendant inflicted upon Plaintiff and Class Members.

174. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Sensitive Information. Defendant had a duty to use reasonable security measures to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information."[44] Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.[45]

175. Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key."[46]

176. Plaintiff and Class Members are within the class of persons that the HIPAA was intended to protect. And the injuries that Defendant inflicted on Plaintiff and Class Members are precisely the harms that HIPAA guards against. After all, the Federal Health and Human Services' Office for Civil Rights ("OCR") has pursued enforcement actions against businesses which—because of their failure to employ reasonable data security measures for PHI— caused the very same injuries that Defendant inflicted upon Plaintiff and Class Members.

---

[44] 45 C.F.R. § 164.530(c)(1).

[45] *Id.*

[46] *See id.* § 164.304.

177. Under the Health Information Technology for Economic and Clinical Health Act ("HITECH"), Defendant has a duty to promptly notify "without unreasonable delay and in no case later than 60 calendar days after the discovery of a breach" the respective covered entities and affected persons so that the entities and persons can take action to protect themselves.[47]

178. Moreover, the HITECH states that, "[a] covered entity that accesses, maintains, retains, modifies, records, stores, destroys, or otherwise holds, uses, or discloses unsecured protected health information (as defined in subsection (h)(1)) shall, in the case of a breach of such information that is discovered by the covered entity, notify each individual whose unsecured protected health information has been, or is reasonably believed by the covered entity to have been, accessed, acquired, or disclosed as a result of such breach."[48]

179. The HITECH further provides, "[a] business associate of a covered entity that accesses, maintains, retains, modifies, records, stores, destroys, or otherwise holds, uses, or discloses unsecured protected health information shall, following the discovery of a breach of such information, notify the covered entity of such breach. Such notice shall include the identification of each individual whose unsecured protected health information has been or is reasonably believed by the business associate to have been, accessed, acquired, or disclosed during such breach."[49]

180. Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII and PHI.

---

[47] 42 U.S.C. § 17932(d)(1).

[48] *Id.* § 17932(a).

[49] *Id.* § 17932(b).

181. Defendant owed Plaintiff and Class Members a duty to notify them within a reasonable time frame of any breach to their Sensitive Information. Defendant also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is necessary for Plaintiff and Class Members to take appropriate measures to protect their Sensitive Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of Defendant's Data Breach.

182. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from its inadequate security protocols. After all, Defendant actively sought and obtained the Sensitive Information of Plaintiff and Class Members.

183. Defendant breached its duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Sensitive Information. And but for Defendant's negligence, Plaintiff and Class Members would not have been injured. The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Sensitive Information;
b. Failing to comply with—and thus violating—HIPAA and its regulations;
c. Failing to comply with—and thus violating—HITECH and its regulations;
d. Failing to comply with—and thus violating—FTCA and its regulations;
e. Failing to comply with—and thus violating—the VDBNL and its regulations;
f. Failing to adequately monitor the security of its networks and systems;

g. Failing to have in place mitigation policies and procedures;

h. Allowing unauthorized access to Plaintiff's and Class Members' Sensitive Information;

i. Failing to detect in a timely manner that Plaintiff's and Class Members' Sensitive Information had been compromised; and

j. Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

184. Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

185. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

186. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Sensitive Information.

187. Simply put, Defendant's negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injuries-in-fact and damages. These injuries include, but are not limited to, the theft of their Sensitive Information by criminals, improper disclosure of their Sensitive Information, lost benefit of their bargain, lost value of their Sensitive Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted

from and were caused by Defendant's negligence. Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

188. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

189. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

**Count III**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Nationwide Class)**

190. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

191. Defendant required Plaintiff and Class Members to provide and entrust their Sensitive Information as a condition of obtaining services from Defendant.

192. Plaintiff and Class Members paid money to Defendant, directly and/or indirectly, in exchange for goods and/or services, as well as Defendant's promise to protect their Sensitive Information from unauthorized disclosure.

193. Defendant promised to comply with HIPAA standards and to make sure that Plaintiff's and Class Members' Sensitive Information would remain protected.

194. Implicit in the agreement between Defendant and Plaintiff and Class Members was the obligation that both parties would maintain the Sensitive Information confidentially and securely.

195. Defendant had an implied duty of good faith to ensure that the Sensitive Information of Plaintiff and Class Members in its possession was used only as authorized, such as to provide medical treatment, billing, and other medical benefits from Defendant.

196. Defendant had an implied duty to protect the Sensitive Information of Plaintiff and Class Members from unauthorized disclosure or uses.

197. Additionally, Defendant implicitly promised to retain this Sensitive Information only under conditions that kept such information secure and confidential.

198. Through its course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Sensitive Information.

199. Defendant solicited and invited Plaintiff and Class Members to provide their Sensitive Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Information to Defendant.

200. Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant. Defendant did not. Plaintiff and Class Members would not have provided their confidential Sensitive Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Sensitive Information for uses other than medical treatment, billing, and obtaining benefits from Defendant.

201. Defendant breached the implied contracts with Plaintiff and Class Members by failing to safeguard and protect Plaintiff's and Class Members' Sensitive Information; failing to provide timely and accurate notice to Plaintiff and Class Members that their Sensitive Information was compromised as a result of the Data Breach; and violating industry standards as well as legal

obligations that are necessarily incorporated into implied contract between Plaintiff, Class Members, and Defendant.

202. Defendant further breached the implied contracts with Plaintiff and Class Members by failing to comply with its promise to abide by HIPAA.

203. Defendant further breached the implied contracts with Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information Defendant created, received, maintained, and transmitted in violation of 45 CFR 164.306(a)(1).

204. Defendant further breached the implied contracts with Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1).

205. Defendant further breached the implied contracts with Plaintiff and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 CFR 164.306(a)(2).

206. Defendant's failures to meet these promises constitute breaches of the implied contracts.

207. Furthermore, the failure to meet its confidentiality and privacy obligations resulted in Defendant providing goods and services to Plaintiff and Class Members that were of a diminished value.

208. Defendant's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Sensitive Information in exchange for medical treatment and services.

209. As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) (a) ongoing,

imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (b) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (c) loss of the confidentiality of the stolen confidential data; (d) the illegal sale of the compromised data on the dark web; (e) lost work time; and (f) other economic and non-economic harm.

210. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

**Count IV**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class)**

211. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

212. This claim is pleaded solely in the alternative to Plaintiff's breach of implied contract claims.

213. Plaintiff and Class Members conferred a monetary benefit on Defendant by paying money for healthcare services that relied on Defendant to render certain services, a portion of which was intended to have been used by Defendant for data security measures to secure Plaintiff's and Class Members' Sensitive Information. Plaintiff and Class Members further conferred a benefit on Defendant by entrusting their Sensitive Information to Defendant from which Defendant derived profits.

214. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Sensitive Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class

Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide adequate security.

215. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

216. Defendant acquired the monetary benefit, PII, and PHI through inequitable means in that Defendant failed to disclose the inadequate security practices, as described herein, and failed to maintain adequate data security.

217. If Plaintiff and Class Members knew that Defendant had not secured their Sensitive Information, they would not have agreed to give their money—or disclosed their data—to Defendant.

218. Plaintiff and Class Members have no adequate remedy at law.

219. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered—and will continue to suffer—a host of injuries, including but not limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their Sensitive Information is used; (3) the compromise, publication, and/or theft of their Sensitive Information; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Sensitive Information; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their

Sensitive Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Sensitive Information in its possession; and (7) future expenditures of time, effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of Defendant's Data Breach.

220. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and data security practices alleged in this Complaint.

221. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Data Breach alleged herein.

**Count V**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Nationwide Class)**

222. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

223. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardian of Plaintiff's and Class Members' Sensitive Information, Defendant became a fiduciary by its undertaking and guardianship of the Sensitive Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Sensitive Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

224. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with its current and former patients to keep secure their Sensitive Information.

225. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiff and the Class in a reasonable and practicable period of time.

226. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Sensitive Information.

227. Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

228. Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Sensitive Information.

229. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Sensitive Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Sensitive Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Sensitive Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate

measures to protect the Sensitive Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

230. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**Count VI**
**Invasion of Privacy – Publication of Private Facts**
**(On Behalf of Plaintiff and the Nationwide Class)**

231. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

232. Plaintiff and Class Members had a reasonable expectation of privacy in their Sensitive Information entrusted to Defendant.

233. Plaintiff and Class Members entrusted Defendant with confidential, non-public Sensitive Information that they intended for only Defendant to receive and that they understood Defendant would keep private.

234. Plaintiff and Class Members have a reasonable expectation that Defendant would safeguard and not disclose PII, PHI, and confidential communications to third parties without Plaintiff's or Class Members' authorization, consent, or knowledge.

235. Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's representations, Notice of Privacy Practices, and applicable legal obligations, such as those arising under HIPAA. Moreover, Plaintiff and Class Members have a general expectation that their sensitive PII and PHI will be kept confidential by their healthcare services provider.

236. Defendant allowed the unauthorized access and/or exfiltration of Plaintiff's and Class Members' Sensitive Information by unknown third parties by failing to adopt and maintain reasonable data security measures, as described herein.

237. Defendant's actions and omissions gave publicity to the Sensitive Information of Plaintiff and Class Members, allowing their Sensitive Information to be obtained by unauthorized third parties and likely posted for sale on the dark web without Plaintiff's or Class Member's knowledge or consent.

238. Defendant's failure to maintain and safeguard the confidentiality of Plaintiff's and Class Member's Sensitive Information, the resulting disclosure of their Sensitive Information, and the loss of privacy and confidentiality of Plaintiff's and Class Members' Sensitive Information is highly offensive to the reasonable person.

239. Plaintiff and Class Members did not authorize, consent, know about, or take any action to indicate consent to Defendant's conduct alleged herein.

240. There is no legitimate public concern with respect to the Sensitive Information of Plaintiff and Class Members.

241. As a result of Defendant's invasion of Plaintiff's and Class Members' privacy and unauthorized disclosure of Plaintiff's and Class Members' Sensitive Information, Plaintiff and Class Members have been needlessly harmed by having their private and confidential medical information disseminated for profit by malicious third parties.

242. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

243. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, restitution injunctive relief, reasonable attorneys' fees and costs, and any other relief that is just and proper.

244. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT VII**
**Violation of the Virginia Data Breach Notification Law ("VDBNL")**
**Virginia Code § 18.2-186.6(B)**
**(On behalf of Plaintiff and the Virginia Subclass)**

245. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

246. Virginia Code § 18.2-186.6(B) requires entities that possess the computerized data of a Virginia resident, including personal information, must disclose without unreasonable delay any breach of its security system upon discovery or notification of the breach. Notice must go to the Office of the Attorney General and any affected Virginia resident.

247. This statute applies to Defendant because it "maintains computerized data that includes personal information that the individual or entity does not own or license," pursuant to Virginia Code § 18.2-186.6(B).

248. This statute expressly authorizes a Virginia resident to recover direct economic damages.

249. Virginia Code § 18.2-186.6(A) defines "personal information" as "the first name or first initial and last name in combination with and linked to any one or more of the following data elements that relate to a resident of the Commonwealth, when the data elements are neither

encrypted nor redacted: 1. Social security number; 2. Driver's license number or state identification card number issued in lieu of a driver's license number; 3. Financial account number, or credit card or debit card number, in combination with any required security code, access code, or password that would permit access to a resident's financial accounts; 4. Passport number; or 5. Military identification number."

250. Plaintiff's and Class Members' personal information, as defined by Virginia Code § 18.2-186.6(A), including his name and Social Security number, was compromised by Defendant through the Data Breach.

251. Defendant's Notice of Data Breach was sent at nearly *nine months* after Defendant claims to have discovered the breach. This Notice was not timely sent and constitutes unreasonable delay.

252. Plaintiff and Class Members have suffered economic injury due to and traceable from the timing of the delayed notification. First, Plaintiff's and Class Members' injuries are solely the result of the Data Breach itself. Second, if Plaintiff and Class Members had been aware of the data breach earlier, they could have taken additional action to prevent identity theft, continued disclosure of their Sensitive Information, and the economic injuries arising therefrom.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a) For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and his counsel as Class Counsel;

b) For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class

Members' Sensitive Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c) For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Sensitive Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e) Ordering Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of punitive damages, as allowable by law;

h) For an award of attorneys' fees and costs under the common fund doctrine, and any other applicable law;

i) Costs and any other expense, including expert witness fees, incurred by Plaintiff in connection with this action;

j) Pre- and post-judgment interest on any amounts awarded; and,

k) Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: January 16, 2024

*/s/ William N. Sinclair*

William N. Sinclair (Bar No. #28833)
Silverman Thompson Slutkin & White, LLC
400 E. Pratt St., Suite 900
Baltimore, MD 21202
(410) 385-2225 (T)

(410) 547-2432 (F)
bsinclair@silvermanthompson.com

Christopher D. Jennings*
Tyler Ewigleben*
Laura Edmondson*
**THE JOHNSON FIRM**
610 President Clinton Ave., Suite 300
Little Rock, AR 72201
Tel: (501) 372-1300
chris@yourattorney.com
tyler@yourattorney.com
ledmondson@yourattorney.com

*To be admitted *pro hac vice*

*Counsel for Plaintiff and the Proposed Class*